2008 VT 3

## State of Vermont v. Elizabeth McAllister

[945 A.2d 863]

No. 06-037

Present: **Reiber, C.J., Dooley, Johnson and Skoglund, JJ., and Bent, Supr. J.,** Specially Assigned

Opinion Filed January 18, 2008

*William H. Sorrell*, Attorney General, and *Jeffrey R. Schinnerer*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Kelly Green*, Appellate Defender, Montpelier, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Defendant Elizabeth McAllister appeals the trial court's denial of her motion to suppress certain evidence and her motion for a judgment of acquittal. Defendant was convicted of one count of transportation of a regulated drug into a place of detention, 18 V.S.A. § 4249, and one count of possession of a narcotic drug, 18 V.S.A. § 4234(a). At the close of the State's evidence, defendant moved to suppress pills that were taken from her during a strip-search at the Southeast State Correctional Facility, arguing that the State had not established a sufficient chain of custody to ensure their identity. She also moved for a judgment of acquittal, arguing that the State failed to prove an element of each of the crimes charged. We affirm.

¶ 2. The evidence at trial established the following. On January 10, 2005, defendant was transported by the sheriff's department to the Southeast State Correctional Facility from the Southern State Correctional Facility for admission. As part of the Southeast State Correctional Facility's admission procedure, all detainees coming into the facility are strip-searched in a small room off of the booking area. Defendant was no exception. The correctional officer who performed the search inspected defendant's clothes, hair, and body cavities. After defendant removed her clothing, the officer noticed plastic protruding from defendant's vagina. When asked to remove the plastic, defendant refused and pushed it farther into her vagina. Defendant was warned that if she did not remove the plastic she would be taken for an x-ray. Defendant removed a plastic bag from her body and held it over her head while seeming to crush the bag with her hand. She then repeatedly held her hand out, as if to give the plastic bag to the officer, and then pulled the hand away. Eventually, two small white pills fell from defendant's hand. The officer then grabbed defendant's hand and ordered her to release the bag.

¶ 3. When she had custody of the bag, the officer was able to see that it contained orange and white pills. She retrieved the pills that had fallen on the floor, put them in the plastic bag, pulled her latex glove around the bag and the pills, and placed the glove in her pocket. She completed the exam, then contacted her supervisor and notified him of what she had found. When the supervisor arrived, he asked defendant why she had the pills, and defendant responded that they were her "meds" and that they were methadone and Percocet.

¶ 4. The supervisor took possession of the glove with the pills and went to the facility nurse for help in identifying them. After identifying some of the pills as methadone, the supervisor placed the pills in a paper envelope. The supervisor testified that it was his common practice to label the item with a detainee's name, a description of what was found, and the date. He testified that, in this case, he sealed the envelope and wrote defendant's name on it. The supervisor then placed the envelope into the facility safe, as is the procedure for contraband confiscated from inmates. Later, he retrieved the envelope from the safe and gave it to State Trooper McLaughlin. Trooper McLaughlin did not testify.

¶ 5. In the record, the envelope next appears in the possession of the senior trooper assigned to investigate the case. This officer

testified that he was given the evidence bag containing the envelope and the pills and that the bag did not appear to have been tampered with in any way. The investigating officer recognized the handwriting on the evidence bag as Trooper McLaughlin's, and testified that it was "fair to say" that Trooper McLaughlin was the one who packaged the evidence.

¶ 6. Upon receipt of the evidence bag, the investigating officer immediately opened it and photographed and inventoried the contents. He testified that the evidence bag contained a white envelope, sealed with clear plastic tape, which contained the pills and a piece of plastic. The photograph, which was admitted into evidence, shows that there were fourteen white pills and one broken orange pill. The photograph and the investigating officer's testimony reveal that the envelope that was in the evidence bag had the return address of the correctional facility printed on it and the phrase "Pills Taken 1/10/05" written on it, but that defendant's name was nowhere on the envelope. After completing the inventory and the associated paperwork, the officer put the envelope, pills and plastic back into the evidence bag, sealed and labeled it with the case number, and put it in the State Police Barracks evidence room. He also filled out a Request for Laboratory Examination form, referred to as a 305 Form, for examination of the drug evidence. He testified that the 305 Form also serves as a tracking form, a detailed documentation of the item or items sent to the lab for examination, and as a brief case history as well as a chain of custody report.

¶ 7. The next day, the senior trooper transported the evidence to the Vermont Forensic Laboratory. The 305 Form indicates that "DJ" at the evidence lab received the evidence bag from him, and on the same day placed the evidence bag in the forensic lab's evidence room. A forensic chemist at the laboratory testified that when she retrieved the evidence bag from the evidence room and opened it to perform testing, the 305 Form's description of what was in the evidence bag was consistent with what she found in the evidence bag. She also testified that it is standard procedure to check the seal on the evidence when she retrieves it for testing, and that she does it every time. The forensic chemist was able to identify some of the pills as two types of methadone and another as oxycodone. Through chemical analysis, she was able to establish that the broken pill was morphine.

¶ 8. A jury trial was held in September 2005. At the close of the State's evidence, defendant moved to suppress the drug evidence

and also moved for a judgment of acquittal. Both motions were denied. The jury found defendant guilty of transporting a regulated drug into a place of detention and possessing a narcotic drug. Defendant appeals.

¶ 9. On appeal from denial of a motion to suppress, we review the trial court's legal conclusions de novo. *State v. Coburn*, 2006 VT 31, ¶ 8, 179 Vt. 448, 898 A.2d 128. At the close of the State's evidence, defendant moved to exclude all evidence of the pills and their analysis, claiming that there are two major breaks in the chain of custody that make testimony about the pills inadmissible. Defendant asserts that without the testimony of Trooper McLaughlin — the officer that took the evidence from the corrections officials and placed it in an evidence bag — the chain of custody of the pills cannot be established. Second, defendant asserts that the lack of testimony from the person at the Vermont Forensics Lab who initially received the evidence bag from the investigating officer is another break in the chain of custody that makes the evidence inadmissable. Defendant contends that without the testimony of these two people we cannot be certain that the pills tested at the lab were the ones taken from defendant.

■ ■ ¶ 10. "Generally, chain of custody is established if a sample is sealed and labeled upon collection and received by the technician performing the test in that condition." *Dep't of Soc. Welfare v. Miller*, 157 Vt. 92, 96, 595 A.2d 288, 290 (1991); see also *State v. Comstock*, 145 Vt. 503, 506-07, 494 A.2d 135, 137 (1985) (holding that a chain of custody is sufficient where the evidence arrived at the lab through the mail in the same condition as when the officer prepared it, with seal intact, and where there was "no evidence of tampering with, change in, or confusion of the sample during the mailing"). "The identity of a specimen used in drug testing need not be proved beyond all possibility of doubt to be admissible." *King v. Gorczyk*, 2003 VT 34, ¶ 9, 175 Vt. 220, 825 A.2d 16. If the circumstances establish "reasonable assurance of the identity of the sample" tested, then the chain of custody is sufficient to allow admission of the sample. *Miller*, 157 Vt. at 94, 595 A.2d at 290. "The chain need not be perfectly established." *State v. Stevens*, 137 Vt. 473, 477, 408 A.2d 622, 625 (1979).

■ ¶ 11. Here, the trial court correctly held that the chain was sufficiently reliable and established. The gap in the chain of custody in this case is similar to the situation presented in *State*

*v. Stevens*. In *Stevens*, there was no evidence as to who possessed the sample from the time that it was removed from a police refrigerator until it was received by the lab technician for testing. 137 Vt. at 477, 408 A.2d at 625-26. We held that because the sample was received by the lab technician in the same condition in which the collecting officer had left it, the gap did not make the sample inadmissible. *Id.* In this case, the correctional facility supervisor testified that he sealed the evidence in an envelope and placed it in the facility safe. The investigating officer testified that he detected no tampering with the evidence bag, and that the envelope contained therein was sealed. He also testified that once he completed his inventory of the evidence, he put it back in the evidence bag and sealed it. The forensic chemist testified extensively about the log-in procedure utilized at the forensic laboratory and clearly stated that the 305 Form detailing the contents of the evidence bag accurately described what she found in the bag. We agree with the trial court that the evidence gives reasonable assurance as to the identity of the pills, and thus the pills and the related testimony were admissible.

¶ 12. Defendant next claims that the trial court erred in denying her motion for acquittal. She argues that the State failed to prove beyond a reasonable doubt one element in each of the statutes under which she was charged. The first statute, 18 V.S.A. § 4249(a), reads: "No person shall knowingly carry or introduce or cause to be carried or introduced into a . . . correctional facility: . . . (3) a regulated drug, other than marijuana . . . except upon the prescription or direction of a practitioner." The second statute, 18 V.S.A. § 4234(a)(1), reads: "A person knowingly and unlawfully possessing a . . . narcotic drug . . . shall be imprisoned not more than one year or fined not more than $2,000.00, or both." Defendant argues that the State failed to prove beyond a reasonable doubt that the drugs in her possession did not result from a prescription or direction of a practitioner or that defendant's possession of the drugs was unlawful.

¶ 13. "We will affirm a trial court's denial of a motion for acquittal where, viewing the evidence in the light most favorable to the State, there is sufficient evidence to convince a reasonable trier of fact that all the elements of the crime have been proven beyond a reasonable doubt." *Coburn*, 2006 VT 31, ¶ 14; see also V.R.Cr.P. 29. "In reviewing a denial of a Rule 29 motion, this Court must determine whether the evidence presented by the

State, taken in the light most favorable to the prosecution and excluding any modifying evidence, sufficiently and fairly supports a finding of guilt beyond a reasonable doubt." *State v. Durenleau*, 163 Vt. 8, 10, 652 A.2d 981, 982 (1994). We assess the strength and quality of the evidence; "evidence that gives rise to mere suspicion of guilt or leaves guilt uncertain or dependent upon conjecture is insufficient." *Id.* (citations omitted). "In assessing circumstantial evidence, the fact-finder may draw rational inferences to determine whether disputed ultimate facts occurred." *Id.* at 12, 652 A.2d at 983. We make no hard and fast rule as to the sufficiency of circumstantial evidence in a criminal case. See *State v. Baird*, 2006 VT 86, ¶ 13, 180 Vt. 243, 908 A.2d 475. However, evidentiary gaps must be filled with more than speculation, and all of the evidence, in sum, must produce more than a mere suspicion of guilt. *Id.*; *Durenleau*, 163 Vt. at 12-13, 652 A.2d at 983. Finally, "a judgment of acquittal is proper only if the prosecution has failed to put forth any evidence to substantiate a jury verdict." *State v. Couture*, 169 Vt. 222, 226, 734 A.2d 524, 527 (1999).

¶ 14. The prosecution used the same facts to support the unlawfulness under 18 V.S.A. § 4234(a) and the absence of a practitioner's prescription or direction under 18 V.S.A. § 4249, so we analyze the claims in unison. Defendant claims that the circumstantial evidence was insufficient for a reasonable jury to find her guilty as charged. We disagree.

¶ 15. The medical intake procedure at the Southeast State Correctional Facility was described for the jury. The procedure includes an interview with the facility nurse, who asks the detainee if she is on any medications. If the answer is yes, then the nurse verifies the prescription with the detainee's doctor, as well as the correctional facility doctor. Once verified, the prescription is dispensed by facility staff during the three daily medication calls.

¶ 16. Due to the discovery of the drugs at admission, this procedure was detoured. Testimony established that defendant did not notify correctional facility staff that she was on medication or that she was carrying her medication before the strip-search, when the pills were discovered in defendant's vagina. While an individual may carry his or her possessions in a variety of ways, it was reasonable for the jury to infer that defendant secreted the pills in this manner because she knew they were regulated drugs,

and she believed she would not be allowed to bring them into the correctional facility. Her actions suggest that she did not have a prescription or the direction of a practitioner, or have legal possession of the pills. Second, the jury heard that once the pill container was discovered defendant resisted giving the plastic bag to the correctional facility staff member and appeared to grind it in her hand. It could be reasonably inferred that defendant attempted by this action to destroy the pills to prevent their identification. This behavior also suggests that she did not have a prescription or the direction of a practitioner, and that her possession of the pills was unlawful. Third, when asked by the facilities supervisor "what the story was" behind the pills, defendant did not produce the name of a prescribing practitioner, a prescription, or a prescription bottle, nor did she even claim to have a prescription or the direction of a practitioner to take the pills. She merely stated that they were her "meds." It is a reasonable inference that she did not do any of these things because she did not have a prescription or the direction of a practitioner and because her possession of the pills was unlawful. Finally, defendant herself identified the pills as methadone and Percocet — regulated drugs.[1] A chemical analysis by the State indicated that the pills were methadone, oxycodone and morphine — different regulated drugs. 18 V.S.A. § 4201(29).

 ¶ 17. There are two types of evidence in every case from which a jury may find the truth. Direct evidence — a document or the testimony of a person asserting actual and personal knowledge of a particular fact — leaves no room for inference. Circumstantial evidence does not directly prove a fact, but is part of a chain of facts and circumstances that indicate a defendant's guilt or innocence. The law does not require the State to establish guilt by direct evidence alone. *Baird*, 2006 VT 86, ¶ 31. The law makes no distinction between the weight given to either direct or circumstantial evidence, nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. See *id.* Indeed, certain types of circumstantial evidence may be more trustworthy than certain types of direct evidence.

---

[1] The definition of a "regulated drug" includes "a narcotic drug." 18 V.S.A. § 4201(29)(A). Testimony from the forensic chemist established that Percocet, morphine, methadone and oxycodone are all narcotics. Percocet is a brand name for a blend of oxycodone and acetominephen produced by the Du Pont Pharmaceutical Company.

¶ 18. The evidence of defendant's actions and behaviors was sufficient for a reasonable trier of fact to find, beyond a reasonable doubt, that defendant brought regulated drugs into a correctional facility, that she did not possess the drugs by prescription or the direction of a practitioner, and that her possession of the narcotic drugs was unlawful. Therefore, the State met its burden of proof on each element, and the denial of the motion for acquittal was appropriate.[2]

¶ 19. The State's case against defendant was a circumstantial one. It is the nature of such a case that the jury verdict is both reached and sustainable on the basis of the evidence as a whole. Fundamentally, the dissent's evaluation of each piece of circumstantial evidence in a vacuum, without the benefit of its evidentiary context, is at odds with this principle and causes the dissent to miss the forest for the trees. See *Baird*, 2006 VT 86, ¶ 13 ("When reviewing a case based largely on circumstantial evidence, the evidence 'must be considered together, not separately,' even if defendant can explain each individual piece of evidence in a way that is inconsistent with guilt." (quoting *State v. Grega*, 168 Vt. 363, 380, 721 A.2d 445, 457 (1998))). As a consequence and in addition, the dissent makes two basic errors. The first is its conclusion that defendant said nothing from which the jury could properly infer unlawful possession — either because her statements did not "demonstrate[] falsity" or an intent to "mislead the prison workers," *post*, ¶ 28, or otherwise. The second is its conclusion that therefore the jury relied on so-called "consciousness-of-guilt evidence" alone to convict.

¶ 20. If the jury's entitlement to infer guilt from defendant's explanation for possessing narcotics indeed depends — as the dissent suggests — on whether her statements demonstrate falsity or an intent to mislead, when viewed in the light of the surrounding circumstances that threshold is certainly met here. Defendant's monosyllabic explanation for her possession did not

---

[2] The trial court instructed the jury that the State was required to prove that defendant acted without the prescription or direction of a practitioner, treating the phrase as an element of the offense which the State must prove beyond a reasonable doubt. The State did not object to this instruction. The State argues on appeal that even if the circumstantial evidence was insufficient to convict, this portion of the statute is an affirmative defense for which defendant, rather than the State, bears the burden of persuasion. Given our resolution of defendant's appeal, we do not address the State's argument.

occur in a vacuum. It was accompanied by an uncouth method of transportation, a failure to promptly turn over the contraband, and — most importantly — an attempt to destroy it in order to prevent its identification. While a jury may have agreed with the dissent that her answer, "meds," was consistent with lawful possession, this jury evidently did not. And because defendant's words were accompanied by evasive and misleading behaviors, even under the dissent's logic, it was entitled not to. But defendant said more from which the jury could infer unlawful possession. The jury was entitled to infer that defendant did not have a prescription for the drugs because she could not accurately identify them.

¶ 21. The dissent does not argue, nor could it, that so-called "consciousness-of-guilt" evidence — which label it attributes to the balance of the State's case — is inadmissible. Rather, it correctly points out that such evidence is insufficient on its own to support a verdict. See, e.g., State v. Unwin, 139 Vt. 186, 193, 424 A.2d 251, 255 (1980) (evidence of flight "is not sufficient by itself to support a conviction"). We have already explained why evidence of defendant's nonverbal behavior need not support the verdict on its own. Therefore, even if the dissent appropriately applies the "consciousness-of-guilt" label to defendant's actions in this case, it was appropriate for the jury to also rely on evidence of defendant's nonverbal behavior to infer unlawfulness and absence of a prescription.

¶ 22. Finally, that the dissent goes to extreme lengths to characterize defendant's bizarre actions as consistent with lawful possession is demonstrated by its absurd conclusion that defendant transported drugs in her vagina not because her possession was illegal, but because it was "very likely" that she had heard that "Vermont Department of Corrections was prohibiting access to methadone in prison for all but a few short-term offenders and department policy was widely covered in the press." Post, ¶ 34. This wide coverage — as reported by the dissent — consists of one newspaper article. The dissent's speculation is unpersuasive.

¶ 23. In summary, Vermont law does not require every person who comes in contact with evidence to testify in order to establish the chain of custody. The State presented sufficient evidence to establish beyond a reasonable doubt that the pills tested by the lab were those obtained from defendant. This evidence establishing that the drugs found in defendant's vagina were regulated

drugs, along with the circumstantial evidence indicating that defendant did not have a prescription for the same nor was she in possession of the drugs under the direction of a practitioner, was sufficient for the jury to convict. We affirm the trial court's rulings.

*Affirmed.*

¶ 24. **Dooley, J.,** dissenting. The central point of the majority's rationale is in its third reason why the motion for acquittal was properly denied:

> Third, when asked by the facilities supervisor "what the story was" behind the pills, defendant did not produce the name of a prescribing practitioner, a prescription, or a prescription bottle, nor did she even claim to have a prescription or the direction of a practitioner to take the pills. She merely stated that they were her "meds." It is a reasonable inference that she did not do any of these things because she did not have a prescription or the direction of a practitioner and because her possession of the pills was unlawful.

*Ante,* ¶ 16. This was exactly the rationale of the district court, which relied upon "[d]efendant's admissions as well as her failure to avail herself of producing a prescription or availing herself of the procedure in place in the correctional facility, that it would allow her to have validly prescribed medication."

¶ 25. In other words, defendant can be found guilty because she failed to prove to the facilities supervisor that she had a prescription for the pills. Whatever the strength of the inference the majority draws, a subject I address below, I believe that it is an inference fundamentally at odds with the allocation of burdens of proof in a criminal case. At its core, the majority's holding is that defendant can be found guilty of an essential element of the crimes because she failed to prove her innocence, relieving the State from its constitutional burden to prove all elements of its case. See *In re Winship*, 397 U.S. 358, 364 (1970) (due process clause requires the State to prove "every fact necessary to constitute the crime" beyond a reasonable doubt). For this primary reason, I dissent from the affirmance of defendant's conviction.

¶ 26. Ours is an accusatorial system of criminal justice including a high burden of proof on the State and an adversarial process.

*Watts v. Indiana*, 338 U.S. 49, 54 (1949). The burden is on the prosecution to "produce sufficient evidence to convince the trier of fact of the accused's guilt . . . without compelling the accused to assist in this prosecution responsibility." 1 W. LaFave, J. Israel & N. King, Criminal Procedure § 1.4(d), at 188 (2d ed. 1999) (describing "cornerstones" of the criminal justice process). In short, the prosecution must "shoulder the entire load." *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 415 (1966). The defendant can " 'remain inactive and secure, until the prosecution has taken up its burden and produced evidence and effected persuasion.' " *Taylor v. Kentucky*, 436 U.S. 478, 483 n.12 (1978) (quoting 9 J. Wigmore, Evidence § 2511, at 407 (3d ed. 1940)). Shifting the prosecution's burden to the defendant is a violation of due process of law. *State v. Cohen*, 568 So. 2d 49, 52 (Fla. 1990).

¶ 27. In this case, the State had the burden for one crime to prove that defendant possessed a narcotic drug "knowingly and unlawfully." 18 V.S.A. § 4234(a). For the other crime, it had the burden to prove that defendant did not have a "prescription or direction of a practitioner."[3] *Id.* § 4249. Defendant said nothing from which we could infer that she possessed the drugs unlawfully. She was never asked whether she had a prescription. When asked the vague question of why she had the pills, she answered that they were her "meds," an answer entirely consistent with lawful possession. When asked what the pills were, she identified them as methadone and Percocet, an answer that was correct,[4] except that she did not disclose the one broken pill was morphine.

---

[3] When the court instructed the jury that defendant's lack of a prescription was an element of the crime, the State did not object, as the majority acknowledges. The State now argues that, even if it did not meet its burden, the prescription exception was an affirmative defense that the defendant must prove by a preponderance of the evidence. Because the State did not preserve this argument, I do not consider whether, under either statute, the prescription issue was an affirmative defense. *Fyles v. Schmidt*, 141 Vt. 419, 422, 449 A.2d 962, 965 (1982) (issues not fairly raised before the trial court are not preserved on appeal).

[4] Oxycodone is the narcotic drug that is in Percocet, which is composed of that drug and acetominephen. See Jane Brody, Many Treatments Can Ease Chronic Pain, N.Y. Times, Nov. 20, 2007, available at *http://query.nytimes.com/gst/fullpage.html?res=9907E4DB1F3EF933A15752C1A961C8B63* (last visited Dec. 26, 2007). A State forensic chemist analyzed the pills and testified at the trial. She identified the pills by the narcotic contained within them. For example, she testified that there were two different types of methadone pills without identifying how they were different. It would be consistent with her testimony to conclude that the oxycodone pills were Percocet pills.

¶ 28. I recognize that there are instances where defendant's responses to inquiries, although not admissions, establish a strong enough inference of guilt. This is not such an instance. We explained the distinction in *State v. Ovitt*, 148 Vt. 398, 402-03, 535 A.2d 1272, 1274 (1986), with respect to statements of alibi. A "false, fabricated or fictitious alibi" is evidence of guilt. *Id.* at 403, 535 A.2d at 1274. On the other hand, simple failure to prove an alibi is not such evidence. *Id.* at 402, 535 A.2d at 1274. We explained in *Ovitt*:

> We agree with defendant that it would have been error to instruct the jury that failure to prove an alibi consti-tutes evidence of guilt. Such an instruction implies that a defendant has some affirmative obligation to establish the alibi. . . . An alibi . . . is simply a denial of the possibility of having committed a crime because of being somewhere else when it was committed. . . .
>
> A jury instruction that a failed attempt to establish an alibi is evidence of some guilt implies a shifting of the burden of proof from the State to the defendant, and as such, violates due process. . . . "[I]t is the burden of the government to prove the complicity of the defendant, not the burden of the defendant to establish his innocence." *United States v. Burse*, 531 F.2d 1151, 1153 (2d Cir. 1976).

*Id.* (some citations omitted). Nothing in defendant's response demonstrates falsity to mislead the prison workers. While defend-ant's response was incomplete as to one of fifteen drugs, the variance is unimportant because defendant admitted all the drugs were narcotics that could be possessed only with a prescription.

¶ 29. Even if the burden shifting adopted by the majority were constitutional, it represents a policy choice we have never adopted and should never adopt. The choice before us is similar to that before the United States Court of Appeals for the Second Circuit in *United States v. Jackson*, 368 F.3d 59 (2004). In that case, the prosecution had to prove that the defendant was a convicted felon and attempted to do so by offering proof that a person with the same first and last name as the defendant had been convicted of a felony, arguing that the proof of the criminal record shifted to the defendant the burden to prove he was not the same person

named in the conviction record. The court rejected the burden shifting sought by the prosecution:

> [W]e do not rest our holding on a constitutional ground. It suffices to say that, at least in this circuit, the rule proposed by the government has never been recognized, and we see no reason why it should be. Putting aside the question whether the courts or Congress or a state legislature could lawfully establish a presumption that would deem an essential element of a crime sufficiently proved by some specified evidence, in the absence of evidence to the contrary, we can see no reason to establish such a presumption for proof of a prior conviction as an element of the offense. . . .
>
> . . .
>
> [A]part from the tensions such a rule would create with the presumption of innocence, there is no need for such a rule, no logic to support it, and no precedent in our circuit to justify it. We decline to create the rule the government advocates.

*Id.* at 65, 68. The court found the presumption unnecessary and of dubious accuracy.

¶ 30. The same reasons expressed by the court in *Jackson* apply here. The corrections intake workers made no serious attempt to determine the status of the drugs they found. They did not ask defendant whether she had a prescription or how she came to possess the drugs. They made no independent attempt to determine whether defendant possessed them lawfully. On the other hand, the rule that the majority endorses, apart from its inconsistency with the presumption of innocence, rests on the dubious assessment that defendant's failure to volunteer an unrequested explanation for her possession of the drugs shows she possessed them unlawfully. Even if the rule were consistent with defendant's due process rights, we should not adopt it.

¶ 31. I see equal, although different, difficulties with the other reason the majority gives for finding sufficient evidence of guilt: that defendant tried to secret the drugs and would not immediately give them to the prison workers when requested. The majority's logic is that if defendant had a prescription, she would have disclosed the drugs and requested to keep them in accor-

dance with the medical intake policy. There is, however, no evidence that defendant knew of this policy or ever had an interview with a facility nurse, evidence the State could have easily provided if it existed. In the absence of such evidence, there are myriad reasons why defendant would attempt to hide the drugs, most entirely unrelated to guilt.

¶ 32. The use of this evidence is based on the rationale that defendant's conduct shows consciousness of guilt: "it was reasonable for the jury to infer that defendant secreted the pills in this manner because she knew they were regulated drugs, and she believed she would not be allowed to bring them into the correctional facility. Her actions suggest that she did not have a prescription or the direction of a practitioner, or have legal possession of the pills." *Ante,* ¶ 16. This consciousness-of-guilt logic is precisely what we employ for evidence of flight to avoid prosecution, evidence we have said has "little probative value" and "is not sufficient by itself to support a conviction." *State v. Unwin,* 139 Vt. 186, 193, 424 A.2d 251, 255 (1980); see generally 2 J. Wigmore, Evidence § 276, at 122 (Chadbourn rev. 1979) ("the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt"); see also *State v. Onorato,* 171 Vt. 577, 579, 762 A.2d 858, 859 (2000) (mem.) (same as to evidence of a suicide attempt); *State v. Giroux,* 151 Vt. 361, 366, 561 A.2d 403, 406 (1989) (upholding jury instruction that flight has "very, very limited probative value" (citation omitted)). We have emphasized the ambiguity of the evidence: "there may be multiple reasons to explain the flight of an innocent person, such as panic, the fear of being apprehended or confronting the police, and the unwillingness to appear as a witness." *Onorato,* 171 Vt. at 579, 762 A.2d at 859. We have also noted that it depends upon multiple inferential steps " 'from the defendant's behavior to flight[,] . . . from flight to consciousness of guilt[,] . . . from consciousness of guilt to consciousness of guilt concerning the crime charged[,] . . . from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.' " *State v. Perrillo,* 162 Vt. 566, 570, 649 A.2d 1031, 1034 (1994) (quoting *United States v. Myers,* 550 F.2d 1036, 1049 (5th Cir. 1977)). We have concluded that "[c]ommon experience does not necessarily support the second and fourth inferences." *Id.*

¶ 33. Our assessment of the weight of consciousness-of-guilt evidence is similar to that of other courts around the country.

Thus, the United States Court of Appeals for the Second Circuit recently said about false exculpatory statements, another variation of the consciousness-of-guilt rationale:

> Although false exculpatory statements to law enforcement officials may be circumstantial evidence of consciousness of guilt and may strengthen inferences supplied by other pieces of evidence, they do not alone prove guilt. As we [have] explained . . . , falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt.

*United States v. Glenn*, 312 F.3d 58, 69 (2d Cir. 2002) (citations omitted).

¶ 34. The evidence here has exactly the deficiencies of the flight evidence. It is a logical inference that defendant secreted the pills because she feared that she could not get them into the correctional facility. Beyond that first step, the inferences dissolve into speculation. Defendant could well have believed that she could not get the drugs into the correctional center irrespective of whether she had a prescription. It is, of course, the nature of a correctional center that many items that are lawful to possess cannot be possessed in the facility. Indeed, this belief was very likely because the Vermont Department of Corrections was prohibiting access to methadone in prison for all but a few short-term offenders and department policy was widely covered in the press. See Bazilchuk, Nine Days of Hell: If Judges Are Ordering Methadone Treatment, Some Parolees Will End up in Jail, The Burlington Free Press, July 8, 2001 ("The state does have a policy: . . . No opiates, not even synthetic opiates such as methadone, in prison")[5]; Vermont Department of Corrections, Directive: #363.01 (April 9, 2004) (inmates may be allowed access

---

[5] The majority chooses to quibble with the description of media coverage of the methadone policy of the Vermont Department of Corrections as "widespread." A search of three of the major newspapers in the state discloses thirty articles covering the department's methadone policy and the controversy generated by it. See, e.g., Tracy Schmaler, Judge Affirms Jail Policy Against Methadone, The Rutland Herald, Aug. 11, 2001; Jack Hoffman, Prisoners' Methadone Policy

to methadone, in the sole discretion of the department, but only if incarcerated for a period that does not exceed thirty days). Even assuming defendant herself believed that her behavior was illegal, defendant's subjective belief that an act is illegal does not make it so any more than a defendant's mistaken belief that her conduct is legal would necessarily excuse potential wrongdoing.

¶ 35. In response to this dissent, the majority attempts to embellish the facts to create a greater inference of guilt. Thus, the majority now says that defendant engaged in an "uncouth method of transportation," as if an unrefined or boorish method of hiding drugs somehow adds to the inference of unlawful possession. The majority says that defendant attempted to destroy the evidence, apparently by crushing the bag in which the pills were found, although at best one pill was broken in two and the chemical makeup of the pills was easy to determine irrespective of their form.

¶ 36. The overall standard for conviction is that the evidence must "sufficiently and fairly" support a finding of guilt beyond a reasonable doubt. *State v. Baird*, 2006 VT 86, ¶ 13, 180 Vt. 243, 908 A.2d 475. The evidence in this case does not meet that standard, whether viewed in isolation or in combination. It is a combination of consciousness-of-guilt evidence that is not sufficient to meet the State's burden of proof and impermissible inferences drawn from improperly placing the burden of proof on defendant. Only the State had the burden to prove that defendant possessed the drugs unlawfully, and it totally failed to meet that burden. If the evidence is sufficient in this case, the unlawful-possession element has essentially been removed from the crime.

¶ 37. I reiterate that it was a simple matter in these circumstances for the corrections officers to ask defendant whether she had a prescription or other direction from a doctor for the drugs she possessed. If she asserted that she possessed the drug lawfully, they could follow up with questions that would enable them to check the accuracy of defendant's representations. It is also a simple matter to inform a person being admitted to a correctional center of the medical-intake policy with respect to drugs before the admission occurs. The failure to take those obvious steps leaves this Court in a position in which we can

---

Lacking, The Times Argus, Jul. 3, 2001; State Critical of Corrections' Decision, The Burlington Free Press, Jul. 3, 2001.

affirm a conviction only by improperly shifting the burden of proof to defendant to explain her actions and relying on evidence of a type we have found to be inadequate in the past. Unlike the majority, I do not believe we can affirm the conviction in these circumstances. I would reverse defendant's convictions.

¶ 38. I am authorized to state that Justice Johnson joins this dissent.